423 F.Supp. 373 (1976)
Ronald RULE et al., Plaintiffs,
v.
INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL AND ORNAMENTAL IRONWORKERS, LOCAL UNION NO. 396, et al., Defendants.
No. 73C140(1).
United States District Court, E. D. Missouri, E. D.
October 6, 1976.
*374 Louis Gilden, St. Louis, Mo., for plaintiffs.
Barry J. Levine, Gruenberg & Souders, St. Louis, Mo., for defendants.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
MEREDITH, Chief Judge.
Plaintiff Ronald Rule, by a second amended complaint, brought this action on behalf of himself and as representative of a class composed of "Negro persons who have been members or are members of said defendant Union and JAC, and Negro persons who are applicants or have been applicants for membership in said defendant Union *375 and JAC." The defendants in this action are International Association of Bridge, Structural, and Ornamental Ironworkers, Local Number 396 (hereinafter Local 396), Ironworkers Joint Apprenticeship Committee of St. Louis, Missouri, (hereinafter JAC), and numerous persons as Trustees of the National Ironworkers and Employer Training Program (hereinafter MTP).
The complaint alleges that the defendants have intentionally engaged in unlawful employment practices against the plaintiffs by discriminating against Negroes with respect to membership in defendant Union and JAC, employment referrals by the defendant Union and JAC, eligibility for training opportunities and apprenticeships by defendant Union and JAC, and by using non-job-related criteria as measuring eligibility for employment referrals, union membership, and apprenticeship and training programs, all of which tend to exclude Negroes as a class. The plaintiffs claim that these alleged acts violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq., and 42 U.S.C. § 1981, and the plaintiffs also claim that the defendants have failed to perform the terms of the Conciliation Agreement entered into by them on or about November 9, 1973. Accordingly, the plaintiffs urge that this Court enjoin the alleged unlawful acts of the defendants and award the plaintiffs back pay that they claim has been lost as a result of such alleged acts, attorney's fees, costs, and damages for the alleged violation of said Conciliation Agreement.
By an order dated July 18, 1974, this Court ruled that Ronald Rule could proceed as the representative of the above-described class. Further, the Court ordered that notice should be sent to all class members along with a letter to be returned in a pre-addressed envelope to the Clerk of the Court indicating whether or not said persons desired membership in the class. Subsequently, on December 20, 1974, this Court decertified the class and permitted the plaintiff to contact those who wished to be joined as plaintiffs in this action. Thereafter, Willie West, Johnnie I. Brown, George Coe, Hiawatha Davis, Lonnie R. Vanderson, Jr., and Willie Nichols were joined as plaintiffs.
On or about November 9, 1973, defendants, Local 396 and JAC, entered into a Consent Decree in the matter of United States of America v. International Association of Bridge, Structural and Ornamental Ironworkers, No. 71-C-559(2), (hereinafter consent decree). Said consent decree was entered during the pendency of this action.
This matter was tried to the Court without a jury. The Court has been duly informed by briefs, exhibits, depositions, and testimony. The Court makes the following findings of fact and conclusions of law.

Findings of Fact
1. Ronald Rule was referred to Local 396 in 1966 by a representative of the Urban League for the purpose of making application to the JAC.
2. He completed the application on June 17, 1966, and was informed that a high school diploma, army discharge papers, and a medical statement were required before his application could be accepted. He left the offices of Local 396 after completion of the application, but did not submit the required high school diploma, army discharge papers, or medical statement.
3. He filed charges with the Equal Employment Opportunity Commission (EEOC) on or about June 30, 1966, alleging racial discrimination on behalf of the defendants.
4. In December 1971 and January 1972, Local 396 and the Missouri Commission on Human Rights entered into a conciliation agreement on behalf of Rule.
5. Rule had no contact with JAC or Local 396 from June 17, 1966, to July 1972, and during that time he lived at a minimum of seven different locations, one of which was in California, and did not notify the defendants of his changes of addresses or telephone numbers.
6. In July 1972, Rule appeared at the offices of Local 396, pursuant to an appointment made with the business agent of Local 396, and, in accordance with the conciliation *376 agreement, he was referred to an ironworker job at his earliest convenience.
7. Rule was given a choice of joining either MTP or JAC. He joined MTP on May 17, 1973, and is currently enrolled in that program.
8. Rule has been referred to several jobs by the defendants.
9. Willie West had been a member of Laborers Local 110 since 1960, and in 1973 became a member of Operating Engineers Local 513.
10. In 1969, West was interviewed by the examining board of Local 396, and was subsequently offered the opportunity to enroll in the National Ironworkers and Employers Training Program at a salary equal to sixty-five percent of a journeyman's wages. He refused this offer, because he was earning more money working as an operating engineer.
11. In November 1973, pursuant to the consent decree, Local 396 offered West the opportunity to take the journeyman's examination of his choice and explained that if he passed the examination, he would be entitled to membership in Local 396. West refused this offer.
12. West is no longer interested in becoming an ironworker.
13. On July 27, 1970, Johnnie I. Brown applied for referral from Local 396, but had no knowledge of the ironworker craft at the time. After applying, he did not return to the Local 396 union hall.
14. In March 1975, Brown made application to the MTP and the application was under consideration at the time of trial.
15. On March 18, 1970, George Coe made application to JAC. He supplied the required material and passed the examination. However, he did not score sufficiently high to be included in the 1970 JAC program.
16. On July 30, 1970, Coe advised JAC that he wished to be re-interviewed and reconsidered for the 1971 apprenticeship class. He was sent letters dated April 21, 1971, and May 20, 1971, notifying him to appear at the test site for retesting during 1971. He failed to appear and his file was, therefore, inactivated by JAC.
17. Hiawatha Davis made application to JAC on May 14, 1973. He passed the examination given him by JAC, but did not submit a medical statement, although requested to do so. Davis voluntarily withdrew from consideration for JAC, because he was advised of the possibility that he might have to relocate outside St. Louis in rural Missouri in order to keep working.
18. Lonnie R. Vanderson, Jr., applied for JAC on October 29, 1974. He passed the examination which qualified him for consideration for apprenticeship training, but at the time of trial had not been accepted or rejected by JAC.
19. Willie Nichols applied for the MTP on February 22, 1973. On May 21, 1973, Construction Manpower referred Nichols to Kozeny-Wagner, a contractor, where he was employed as a carpenter trainee until November 23, 1973. Thereafter, he terminated his participation in the MTP.
20. MTP attempted to contact Nichols on August 13 and 15, 1973, but was unable to reach him. Subsequently, MTP inactivated his application and file upon being informed that he was a member of the carpenter training program.
21. None of the plaintiffs herein have made application for membership in Local 396.
22. Local 396 is a labor organization within the meaning of 42 U.S.C. § 2000e(d), and its principal place of business is 2500 59th Street, St. Louis, Missouri. It has geographical jurisdiction over the City of St. Louis and various counties in the eastern half of Missouri. Local 396 is a party to collective bargaining agreements with employers of ironworkers represented by the Associated General Contractors of St. Louis, Concrete Contractors Association, Site Improvement Association, and the Erectors and Riggers Association, and with contractors not members of the associations. These contracts cover building, heavy and *377 highway construction within the geographical jurisdiction of the agreements.
23. Local 396 is a member of and subject to the constitution of the International Association of Bridge, Structural, and Ornamental Ironworkers, AFL-CIO (hereinafter International).
24. Membership in Local 396 is based upon the following requirements:
(a) Over eighteen (18) years of age, actively engaged in the ironwork trade, pay the uniformly required initiation fees and dues required for journeyman membership, and one of the following four admissions procedures:
(1) Completion of Iron Workers Local 396 apprenticeship Program and passage of a journeyman's examination.
(2) Completion of the Iron Workers Local 396 Minority Training Program and passage of a journeyman's examination.
(3) Direct admission to membership after working through Local 396 for a period of six months on a service dues receipt basis and a passage of a journeyman's examination.
(4) Transfer from another Iron Workers construction local.
Since December 1973, the membership requirements have been posted in the union hall of Local 396.
25. There are seven classifications of ironworker and a test is given for each classification. The test is both written and demonstrative and is job related. The individual requesting the examination also requests the desired classification for which he seeks to be tested. Upon passage of the examination, with a score of seventy or above, the member is given a card identifying the classification of his membership.
26. No black has been refused membership in Local 396 since 1972.
27. Prior to October 1972 the union had no agreed referral procedure; therefore, the ironworkers either solicited their own employment or waited in the union hall and obtained jobs when the business manager called for them.
28. The collective bargaining agreement for the years 1972-75, which became effective August 9, 1972, contained the first referral procedure for Local 396. In accordance with this agreement, journeymen with over 6,000 hours were given priority in referrals.
29. On or about November 9, 1973, the consent decree altered this procedure by providing in paragraph 27:
"For purposes of priority in referral to jobs, the Union may maintain the following referral groups:
(a) Group I:
Qualified Journeymen:
(1) Persons who have completed an approved apprenticeship or minority training program as administered by Local 396 and contractors, or
(2) Persons who have worked 6,000 hours at the ironworker trade for contractors within the jurisdiction of Local 396, or
(3) Persons who have passed a journeyman's examination prior to the effective date of this decree, or
(4) Any minority group person who registers for referral, regardless of union membership or number of hours worked in the trade.
(b) Group II:
Apprentices: a person indentured in the Apprenticeship Training Program established under the collective bargaining agreement.
Minority Trainees: a person who has been accepted into the Minority Training Program to which the union is a party.
(c) Group III:
Probationary Employees: all other persons who register for referral."
30. Any minority registrant for referral may solicit employment within the jurisdiction of Local 396, regardless of hours worked, or whether or not JAC or MTP has been completed.
31. Upon making application for referral by Local 396, the applicant specifies his qualifications and what type of work he is best qualified to perform. Applicants for *378 referral are referred out by Local 396, pursuant to a request by a contractor for referral of an applicant for employment. The contractor specifies the qualifications and the union business agent advises those applicants present in the union hall of the job. Requests for referral of apprentices are usually made to the JAC coordinator and requests for trainees are usually made to the MTP administrator.
32. Ninety percent or more of all employment in the ironwork industry within the Local 396 jurisdiction is filled by direct hire without referral by the union.
33. When a request for referral is made by a contractor, the ironworker with the lowest dispatch number indicating interest in the job is referred. If no journeyman is interested in the job, the business agent will dispatch a MTP trainee or an apprentice, if in the hall. If one is not in the hall, the business agent will notify the MTP administrator so that a trainee can be dispatched.
34. When Local 396 receives a request for referral of a Group II ironworker, the determination as to whether a trainee or apprentice is dispatched is made by the contractor requesting the referral.
35. The procedures for referral registration and the rules for referral are posted in the union hall of Local 396.
36. JAC is a joint labor-management committee controlling apprenticeships within the meaning of 42 U.S.C. § 2000e-2(d). The JAC is an unincorporated body whose membership is composed of five representatives from the Associated General Contractors of St. Louis, Missouri, (hereinafter AGC), with its principal office located in St. Louis, Missouri. The JAC administers and controls the apprenticeship program in the ironwork industry within the geographical jurisdiction of Local 396 and is funded by the Construction Advancement Foundation (CAF) upon approval by CAF of a budget submitted by JAC.
37. JAC is governed by the St. Louis, Missouri, and Vicinity Ironworkers Apprenticeship and Training Standards, jointly approved on February 24, 1964, by the Associated General Contractors of St. Louis, Missouri, and Local 396.
38. Prior to the consent decree, the following requirements were necessary for consideration for admission to JAC by an applicant for apprenticeship:
(a) Be between 18 and 30 years of age (special consideration given to men who have been honorably discharged from the armed servicesmaximum age extended to 35 years of age);
(b) Present a doctor's certificate as evidence of physical fitness sufficient to perform the work of the trade;
(c) Be a United States citizen or have made declaration of intent to become same; and
(d) Have a high school diploma or G.E.D.
39. The consent decree slightly altered the requirements so that now the requirements are:
(a) Be between ages of 18 and 30 (but if a veteran, credit may be given for up to four years' service).
(b) Be physically fit to perform the work of the trade.
(c) Be a high school graduate or have a G.E.D.
(d) Be a citizen of the United States of have made a declaration to become same.
(e) If a test is given meeting the standards set forth, the satisfactory completion of such a test on a pass/fail basis.
(f) Be interested in becoming an ironworker as evidenced by taking an oral interview by membership of the JAC.
40. All JAC requirements have been approved by the Bureau of Apprenticeship and Training, U.S. Department of Labor. JAC gives the Flannigan Industrial Test to JAC applicants. Pursuant to the consent decree, a copy of the test was sent to the Equal Employment Opportunity Commission (hereinafter EEOC), and as of the time of trial, JAC had received no protest from that agency.
41. The number selected for apprenticeship each year is determined by the joint committee and is dependent upon the anticipated *379 work situation in the area. Neither the union nor the management side of the committee can dictate who is to be indentured as an apprentice nor how many apprentices are to be indentured. An applicant for apprenticeship must accumulate not less than seventy points to be considered eligible for admission to the apprenticeship program. The points obtained from the oral interview, the test, high school diploma or G.E.D., and doctor's statement are all added together to reach a total score. The number of positions that the joint committee determines are available in the apprenticeship program each year are filled with the highest scoring eligible applicants.
42. The oral interview of an applicant is conducted by a team composed of one union and one management representative. An applicant may receive a high score of thirty points on the interview. The number of points awarded for each listed factor in the oral interviews is determined by the individual interviewer and is based on his observations and opinions. The points awarded by the interviewers are averaged and the score is totaled with the other points granted the applicant.
43. The Local 396 Minority Training Program is part of the National Ironworkers and Erectors Training Program funded by the United States Department of Health, Education, and Welfare. MTP was commenced in the St. Louis area in August 1970 when Local 396 and certain participating employers voluntarily elected to form the committee as a means of attracting and training minority group individuals to the ironworking industry. An applicant first submits a written application for the MTP and is accepted into the program when a job becomes available based upon work experience and physical condition. The MTP administrator selects the trainees that will participate in a thirty-day trial period, but the final selection is made by JAC.
44. At its commencement in 1970, MTP was a four-year program and the pay scale was equal to fifty percent of that of a journeyman's. Since 1971, it has been a three-year program and starting wages are equal to sixty percent of a journeyman's, with five percent increase each six months. The JAC has permitted trainees to accelerate their wage progression for the purpose of completing the program in less than three years.
45. All individuals who have completed the training program have achieved journeyman membership with Local 396. Trainees are encouraged to solicit their own employment, and even though they were not covered by a collective bargaining agreement prior to 1973, they were not denied the resources of the grievance procedures.
46. Since the inception of MTP, sixty-eight of the seventy-five trainees accepted into the program were black and thirty-eight of the forty-three current trainees are black.
47. The Court finds no evidence in this case to support the plaintiffs' claims that they have been discriminated against by the defendants. To the contrary, the record shows that the defendants have afforded the plaintiffs every opportunity available, and have, in many instances, given blacks a preference over white persons.

Conclusions of Law
1. This Court has jurisdiction over the parties and the subject matter, pursuant to 28 U.S.C. § 1343(4) and 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981.
2. The defendants, Local 396 and JAC, are subject to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981.
3. While speaking of individual relief on Title VII claims, it was held in Gilmore v. Kansas City Terminal Ry., 509 F.2d 48, 51 (8th Cir. 1975), that:
"To establish a prima facie case of employment discrimination upon private claims for relief, an aggrieved party must show:
(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was *380 seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications."
This Court can find no evidence in these proceedings that prove any one of the plaintiffs were denied membership or employment opportunity by the defendants because of their race.
4. The plaintiffs rely heavily on statistical evidence in their attempt to prove that they were discriminated against by the defendants because of their race. In a Title VII action for alleged racial discrimination in the discharging of a black employee, the Court addressed itself to the use of statistics to prove racial discrimination in an action by an individual in King v. Yellow Freight System, Inc., 523 F.2d 879, 882 (8th Cir. 1975), and held:
"Nor does appellant's use of statistics to support his case compel a different result. Statistics may be used to prove a claim of racial discrimination in a class action, ... but this case involves no class claim."
Additionally, in that case, Judge Webster wrote:
"Although statistical evidence of a pattern or practice of discrimination is of probative value in an individual discrimination case for the purpose of showing motive, intent, or purpose, ... it is not determinative of an employer's reason for the action taken against the individual grievant." Id.
Thus, it is clear that statistics may be admitted to prove racial discrimination, but they are not determinative of the reasons "for the action taken against the individual grievant." Id.
5. It is incumbent upon the plaintiffs to introduce evidence that proves a prima facie case that they were discriminated against by the defendants because of their race. King v. Yellow Freight System, Inc., supra, 523 F.2d 879, 881. The Court has found that no such evidence has been presented in these proceedings, therefore, the plaintiffs have not met their burden of proof.
6. The plaintiffs contend that the Flannigan test, used by the defendants as an admission standard, violates the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. While addressing this point, the Supreme Court held in Griggs v. Duke Power Co., 401 U.S. 424, 433-4, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971), that:
"The Equal Employment Opportunity Commission, having enforcement responsibility, has issued guidelines interpreting § 703(h) to permit only the use of job-related tests. The administrative interpretation of the Act by the enforcing agency is entitled to great deference. ... Since the Act and its legislative history support the Commission's construction, this affords good reason to treat the guidelines as expressing the will of Congress."
It should be noted that the consent decree sets forth the procedures which should be followed concerning the proper validation of any test given by the defendants for admission into their programs. The defendants, while complying with the mandates of the consent decree, sent a copy of the Flannigan test to the EEOC, and at the time of trial had received no protest from that agency. Therefore, it seems apparent that the test in question is not violative of the provisions of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.
7. The plaintiffs claim that the referral system, as it is now applied, discriminates against blacks in MTP. This contention is without merit. The evidence clearly shows that blacks are given a preference by being included in referral Group I. Any person not a member of a minority group must either have completed MTP or JAC, worked six thousand hours within the geographical jurisdiction of Local 396, or passed a journeyman's examination prior to the effective date of the consent decree to be included in referral Group I. All a black need do to be included in referral Group I is to register for referral. This system does not discriminate against blacks in MTP.
*381 Further, the plaintiffs contend that since the contractors are given a choice of calling either JAC or MTP for referrals, the defendants aid and abet the contractors in their discriminatory practices, and that this, in effect, is the same as maintaining segregated union halls. They cite statistics to show that apprentices work more hours per year and that the majority of the JAC members are white. First, the contractors of this area are not parties to this suit and no evidence has been introduced to prove or disprove this allegation. Reference to them by the plaintiffs in this context is improper. Aside from that, this Court has decided that statistics alone are not determinative in this case, but even if they were, no evidence has been introduced to demonstrate that minority group members are refused membership in JAC because of their race. Moreover, both JAC and MTP affirmatively endeavor to place participants on jobs and the coordinators of those programs attempt to directly contact employers in an effort to obtain jobs for the participants. Thus, this contention is unfounded.
8. Next, plaintiffs contend that the defendants have breached the conciliation agreement and that simple contract law dictates damages for the alleged violation thereof. It should be noted that an action for the enforcement of this agreement must be brought by the Missouri Human Rights Commission, pursuant to section 296.050, R.S.Mo. In accordance with this section, a private right exists when the commission refuses to proceed. Here, there is no allegation that the commission has refused to proceed. However, even if the plaintiffs had standing in such an action, there has been no evidence presented to this Court which proves that the defendants are in violation of that agreement.
9. Finally, the plaintiffs claim that the defendants are in violation of the consent decree. In paragraph 39 of that decree, the Honorable Judge Regan stated that:
"The Court shall retain jurisdiction over this action for three (3) years from the date of its entry or until such time as the Defendants have achiv ed the objective of this Decree, as set forth in paragraph 2 above. ... In the event that Defendants fail to comply with any provision of this Decree, Plaintiff United States shall notify Defendants, in writing, of such noncompliance. If the Defendants have not, within fifteen (15) days after receipt of such notification, remedied such noncompliance, United States may apply to this Court for an order to show cause why the provisions of this Decree should not be specifically enforced." (Emphasis added.)
The Court has determined that West, and the other plaintiffs, were not discriminated against because of their race by the defendants. Further, the plain language of the consent decree vests the right to bring an action for noncompliance exclusively in the United States. Therefore, the consent decree is not helpful to the plaintiffs.
A judgment will be entered in favor of the defendants and against the plaintiffs and the cause will be dismissed with prejudice.