568 F.2d 558
 16 Fair Empl.Prac.Cas. 35, 15 Empl. Prac.
Dec. P 7943,
17 Empl. Prac. Dec. P 8409,
2 Fed. R. Evid. Serv. 823
Ronald RULE, Lonnie Vanderson, George Coe, Willie Nichols,
Johnnie I. Brown, Hiawatha Davis and Willie West, Appellants,
v.
INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL AND
ORNAMENTAL IRONWORKERS, LOCAL UNION NO. 396, and Ironworkers
Joint Apprenticeship Committee of St. Louis, Missouri, and
Phillip Crowley, Clyde Quick, Hugh Kempka, Clarence
McDonald, J. J. Hunt, Sr., J. J. Hunt, Jr., Robert Boulware,
J. W. Hardesty, Charles W. Ross, William E. Besl, Ralph
Cornell, Fred L. Maddison, Raymond J. Robertson, James J.
Willis, Calvin L. Walker, Joe Rowles, Guilford D. White, and
Frederick Herzog, as Trustees of the National Ironworkers
and Employer Training Program, Appellees.
 No. 76-1945.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 18, 1977.
Decided Nov. 22, 1977.
As Modified on Denial of Rehearing Feb. 21, 1978.
 
 O. Peter Sherwood, New York City, for appellant; Jack Greenberg, New York City, Louis Gilden, St. Louis, Mo., on brief.
 Barry J. Levine, St. Louis, Mo., for appellee; Lewis E. Mallott, St. Louis, Mo., on brief.
 Before VAN OOSTERHOUT, Senior Circuit Judge, and STEPHENSON and WEBSTER, Circuit Judges.
 WEBSTER, Circuit Judge.
 
 
 1
 Ronald Rule, Lonnie Vanderson, George Coe, Willie Nichols, Johnnie Brown, Hiawatha Davis, and Willie West ("plaintiffs") appeal from the District Court's order denying their claims of racial discrimination in employment. We affirm in part, vacate in part, and remand the case for further proceedings.
 
 
 2
 Ronald Rule opened the litigation by filing a complaint on March 14, 1973. Two amended complaints were subsequently filed. The second amended complaint contained three counts and named as defendants Local 396 of the International Association of Bridge, Structural and Ornamental Ironworkers (the "Union"), the Ironworkers Joint Apprenticeship Committee of St. Louis, Missouri ("JAC"), and eighteen individuals who were trustees of the National Ironworkers and Employer Training Program. The individual trustees were subsequently dismissed as parties defendant and National Ironworkers and Employer Training Program ("MTP") was substituted therefor.
 
 
 3
 As amended, Count I of the complaint alleged that defendants had discriminated against Rule on account of his race, in violation of 42 U.S.C. §§ 1981, 2000e et seq., and sought injunctive relief and monetary damages. Count II restated these claims as a class action brought on behalf of "Negro persons who have been members, are members, or might be members of said defendant Union, JAC, and Training Program, and Negro persons who are applicants, have been applicants, or might be applicants for membership in said defendant Union, JAC, and Training Program." Count III alleged that the Union had violated a conciliation agreement entered into by the Union and the Missouri Commission on Human Rights ("MCHR") pursuant to a complaint filed by Ronald Rule.
 
 
 4
 On April 19, 1974, the District Court held a hearing on the class action question. On July 18, 1974, the District Court certified a class composed of: "Negro persons who have been members of said defendant Union and J.A.C., and Negro persons who are applicants or have been applicants for membership in said defendant Union or J.A.C." The order further directed that notices of the pendency of the suit be sent to class members and to black members of, and applicants for, MTP. The notices contained the following "opt-out" provision:
 
 
 5
 Any judgment in the action whether or not favorable to the members of the class will include all members who do not request exclusion or who do not return the notice, and will finally adjudicate the rights, if any, of all class members who have not requested exclusion.
 
 
 6
 Approximately 460 notices were mailed. Of these 460, 79 were returned undelivered, 306 were delivered but not returned, and 75 were delivered and returned. Of these 75, 50 prospective class members requested exclusion, 17 requested inclusion, and 8 were either unsigned or improperly filled out.
 
 
 7
 On December 20, 1974, the District Court entered an order decertifying the class. The District Court said, "(T)he number (of class members who returned notices) indicating a desire to be included is so small in relation to the entire possible class that the request to make this a class action is denied." The decertification order allowed plaintiff Rule to contact those persons who indicated a desire to be included in the class action and join them as parties plaintiff. On January 24, 1975, Vanderson, Coe, Nichols, Brown, Davis, and West were joined as plaintiffs.
 
 
 8
 The case was tried on April 14-16, 1975. On October 6, 1976, the District Court rendered its opinion and judgment in favor of defendants. Rule v. International Association of Bridge, Structural and Ornamental Ironworkers, Local Union No. 396, 423 F.Supp. 373 (E.D.Mo.1976). The court found "no evidence" to support plaintiffs' claim that defendants had discriminated against them because of their race. Id. at 379, 380. In addition, the court held that plaintiffs lacked standing to pursue the claimed breach of the conciliation agreement entered into by the Union and MCHR. Id. at 381.
 
 
 9
 Plaintiffs timely appealed and alleged that the District Court erred by: (1) decertifying the class action; (2) denying plaintiffs' individual claims of racial discrimination; and (3) excluding certain evidence at trial.
 
 
 10
 Prior to addressing the merits of plaintiffs' arguments, we briefly state the relevant facts regarding the structure of the Union, its training programs, and its history of minority employment.
 
 
 11
 The Union is the St. Louis, Missouri, affiliate of the International Association of Bridge, Structural and Ornamental Ironworkers, AFL-CIO and is an affiliate of the Building and Construction Trades Council of St. Louis, Missouri, AFL-CIO. Through various collective bargaining agreements, the Union exercises substantial control of employment in the ironwork trade in the St. Louis, Missouri area. The Union, JAC, and MTP effectively control training opportunities in the trade.
 
 
 12
 Four categories of ironworkers are permitted to work within the territorial jurisdiction of the Union: journeymen, permitmen, apprentices, and trainees. Journeymen are full-fledged Union members who alone select Union officers and, by their vote, determine Union policy. They receive the highest ironworker wage rate ("journeyman's wages") and have an unrestricted right to solicit work.
 
 
 13
 Permitmen are not union members, but do earn journeyman's wages. The term "permitmen" refers to the fact that these persons hold service dues receipts, or "permits," which entitle them to work in the trade. Issuance and revocation of permits is controlled by the Union Examining Board, a group comprised of elected Union officials charged with responsibility for determining individual eligibility for Union membership.
 
 
 14
 Apprentices are unskilled men who have been formally indentured into the traditional ironworker apprenticeship training program. Apprentices are Union members but are subject to a variety of restrictions. Apprentices start at 60 percent of journeyman's wages and receive fractional increases at six-month intervals. The apprenticeship program is administered by JAC, an unincorporated body comprised of five Union members and five representatives of the Associated General Contractors of St. Louis, Missouri.
 
 
 15
 Trainees are enrolled in MTP, a non-profit corporation established in 1970 to provide training opportunities for minorities and "hard core" unemployed whites who are over the apprenticeable age (usually 30). The great majority of trainees are black. Trainees are not Union members, and were not covered by a collective bargaining agreement until 1973. Trainees, like apprentices, receive a percentage of journeyman's wages.
 
 
 16
 Employment in the ironwork trade is a complex matter. Many, if not most, experienced journeymen ironworkers obtain the bulk of their employment by direct solicitation of contractors. Some apprentices, trainees, and journeymen apparently do not have contacts with the contractors, and rely on referrals through the Union hall to obtain employment.[1] The contractor determines the number of ironworkers required and can request journeymen, apprentices, or trainees.
 
 
 17
 Prior to 1964, the ironwork trade in St. Louis was all white.[2] The requirements for Union membership were that the applicant be at least 18 years of age, complete the apprenticeship program or work on service dues receipts within the Union's jurisdiction for six months, pass a demonstration test of skill, and pay an initiation fee. A substantial number of people, including many relatives and friends of ironworkers, chose to work as permitmen. This was one method by which the requisite six months experience could be gained.
 
 
 18
 The Union apprenticeship program was also a major avenue for friends and relatives of ironworkers to enter the trade. Prior to 1964, apprenticeship applicants were not required to meet educational requirements or take aptitude tests. By 1964 the federal government and area civil rights organizations had begun to bring pressure to bear on unions and contractors to increase minority employment opportunities in the construction industry. Correspondingly, increasing numbers of blacks sought entry into the trade. In 1964 JAC first required a high school diploma or a G.E.D. as a prerequisite for entry into the apprenticeship program. In 1965 JAC introduced a battery of aptitude tests to aid in the selection of apprentices.
 
 
 19
 MTP was introduced in 1970. It began as a four-year program with the starting wage of 50 percent of journeyman's wages, as opposed to the three-year apprenticeship program's starting wage of 60 percent of journeyman's wages.[3]
 
 
 20
 In 1972 the Union went on strike. One of the purposes of the strike was to insure greater Union control over referrals of ironworkers to contractors. The newly negotiated collective bargaining agreement contained a clause, known as the "Letter Agreement," which, for the first time, created a system establishing priorities for referral. The Letter Agreement gave first preference in referral to "Qualified Journeymen" i. e., Union members who had worked at least 6000 hours in the trade in the Union's territorial jurisdiction.
 
 
 21
 In 1971 the United States Department of Justice filed suit, pursuant to 42 U.S.C. § 2000e-6, against the Union, JAC, and various other construction trade unions in the St. Louis area (the "Government case"). In November, 1973, the Justice Department entered into a consent decree with the Union and JAC. The decree provided, inter alia, that the Union and JAC would not use unvalidated tests, would not apply the 6000 hour provision to minorities, would abolish the wage differential between trainees and apprentices, and would meet established goals of admission and retention of minorities into the apprenticeship program and MTP.
 
 
 22
 * The Class Action Decertification
 
 
 23
 The determination whether a lawsuit may proceed as a class action is committed to the sound discretion of the District Court, and its determination will not be overturned absent a showing that it has abused its discretion. See, e. g., Wright v. Stone Container Corp., 524 F.2d 1058, 1061 (8th Cir. 1975).
 
 
 24
 The decertification order was based on the fact that only 17 of the 75 notices that were returned to the District Court requested inclusion in the class. This fact, however, must be considered in light of the clear language of the "opt-out" notice, quoted supra. The notice specifically stated that persons who did not return the notice would be bound by the judgment. Only 50 persons requested exclusion, whereas 360 persons failed to return the notice. Since the notice clearly did not require a response,[4] the numerosity requirement must be judged by the size of the class to whom the notices were sent, reduced only by the number of class members who affirmatively elected not to participate or whose notices were returned undelivered. To use as a yardstick the number of class members who affirmatively opted in (17), although not even requested to do so, was to employ a totally unreliable, if not irrelevant, statistic. It was an abuse of discretion to decertify the class on the basis of the notice returns alone, and hence the case must be remanded for consideration of the class claims of racial discrimination.[5]
 
 II
 Plaintiffs' Individual Claims
 
 25
 The seven individual plaintiffs in this case made thirteen separate claims of racial discrimination against defendants. Plaintiff Ronald Rule alone asserted seven different claims. If the District Court had not decertified the class, some of these claims would have been class claims because they are based, not on purposeful discrimination against a particular plaintiff, but on alleged discriminatory patterns and practices applicable to the class. We treat these claims separately.
 
 
 26
 A. The Conciliation Decree.
 
 
 27
 We turn first to plaintiff Rule's claim that the Union violated the conciliation decree entered into by MCHR and the Union. The District Court interpreted the relevant Missouri statute, Mo. Rev. Stat. § 296.050,[6] as providing a private right of enforcement by the aggrieved party only if MCHR refuses to proceed. Because there was no showing that MCHR had refused to proceed, the court held that plaintiff had no standing to pursue this claim.
 
 
 28
 The parties do not cite, nor has our research disclosed, any reported decision by Missouri courts explicating when a private right of enforcement accrues. The statute itself refers only to enforcement actions brought by MCHR. Assuming, without deciding, that a private cause of action may exist, it would accord with the statutory procedure to require an aggrieved complaining party to seek to have MCHR bring a petition for enforcement prior to bringing an action in his own behalf. In view of this, and in accordance with our practice of affording considerable weight to the District Court's interpretation of unsettled questions of state law, see, e. g., Smith v. Nick's Catering Service, 549 F.2d 1194, 1196 (8th Cir. 1977), we affirm the District Court's decision on this claim.[7]
 
 
 29
 B. The Rejection Claims.
 
 
 30
 Plaintiffs Brown, Davis, Nichols, and Rule variously claim that they were denied admission to the apprenticeship program or to MTP or that they were denied referrals by the Union, all on account of race.
 
 
 31
 In assessing these claims, the District Court properly applied the standards enunciated by the Supreme Court in McDonnell Douglas Corp. v. Green,411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In Green, the Court held that, in order for an individual aggrieved party to establish a prima facie case of racial discrimination, he must show:(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.
 
 
 32
 Id. at 802, 93 S.Ct. at 1824. See also Gilmore v. Kansas City Terminal Ry., 509 F.2d 48, 51 (8th Cir. 1975). Once a prima facie case is made, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the aggrieved party's rejection. The aggrieved party is then given an opportunity to show that this reason is pretextual.
 
 
 33
 The record shows that none of the above-named plaintiffs established a prima facie case on their admission and referral claims. Plaintiff Brown was not qualified for referral at the time of his application in 1970, having had no ironwork experience and no knowledge of what ironwork involved. His application to MTP was made only two or three weeks prior to trial, and the record shows that his application was then being actively considered. Plaintiff Davis failed to complete his apprenticeship application by submitting the required doctor's certificate of physical fitness. Plaintiffs Nichols and West were both offered admission into MTP in a timely fashion when work became available, yet both rejected the offer. Finally, the record is unclear whether plaintiff Rule ever formally applied for referral. Even assuming that a proper application was made and denied, and further assuming that Rule was then qualified for referral, he has failed to show that the Union was then referring other persons of similar qualifications.
 
 
 34
 C. The Selection Process Claims.
 
 
 35
 We turn next to the claims of plaintiffs Coe and Vanderson and to another of plaintiff Rule's claims. Both Coe and Vanderson applied for the apprenticeship program, Coe in 1970 and Vanderson in 1974. Both men met all the prerequisites required of applicants to the program.[8]
 
 
 36
 The process of selecting the applicants who will be admitted into the apprenticeship program involves accumulating points, based upon education, physical ability, past experiences, references, residence, an oral interview, and an aptitude test. In order to pass, an applicant must accumulate at least 70 of the possible 100 points. All applicants scoring 70 or higher are ranked in order based upon their scores. Each year JAC meets and determines the number of apprentices to be indentured into the program that year. The determination is based on the members' estimate of employment prospects in the ironwork trade. The positions are filled by the highest ranking applicants.[9]
 
 
 37
 Both Coe and Vanderson scored more than 70 points, but neither scored enough points to be indentured. They contend that the method used to select apprentices is itself racially discriminatory.[10] To this end, they introduced statistical evidence which tended to show that thirty percent of white applicants have been accepted into the program whereas only eleven percent of black applicants have been accepted.
 
 
 38
 Rule has made a related challenge to the apprenticeship eligibility requirements. He contends that the requirement that applicants possess a high school diploma or its equivalent is racially discriminatory. At trial, Rule introduced 1970 census statistics showing that, in a five-county area within the Union's jurisdiction, 50.63% Of white males over the age of 25 have a high school diploma, as compared to 30.89% Of black males in the same age group.
 
 
 39
 These claims, while treated at trial as individual claims, are in reality in the nature of pattern and practice claims i.e., claims based on apparently neutral employment selection criteria which in fact have a statistically disproportionate impact upon blacks. See 42 U.S.C. § 2000e-2. The District Court did not specifically address these claims. Rather, it made the general finding that "no evidence has been introduced to demonstrate that minority group members are refused membership in (the apprenticeship program) because of their race." Rule v. International Association of Bridge, Structural and Ornamental Ironworkers, Local Union No. 396, supra, 423 F.Supp. at 381. We hold that the District Court arrived at this conclusion by applying an incorrect standard of proof.
 
 
 40
 The District Court judged the claims of Coe, Vanderson, and Rule under the standards applied in McDonnell Douglas Corp. v. Green, supra. The Supreme Court in Green specifically recognized, however, that that case did not involve a challenge to employment qualifications. 411 U.S. at 802 n. 14, 93 S.Ct. 1817. When such a challenge is made, in either an individual suit or a class action, the claim should be judged according to the standards set forth in Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).
 
 
 41
 In Griggs, the Supreme Court held that an aggrieved party challenging facially neutral employment qualifications makes out a prima facie case of racial discrimination by showing that the employment qualifications in question have a disparate racial effect. This prima facie case cannot be rebutted by evidence that the employer has no discriminatory motive. Id. at 432, 91 S.Ct. 849. The only way to rebut the prima facie case is by showing that the challenged qualifications are job-related. Id. See also Albemarle Paper Co. v. Moody, 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).
 
 
 42
 Griggs and its progeny have also made it clear that statistical evidence is an important and effective method of proving the disparate racial impact of employment qualifications. See, e. g., Pettway v. American Cast Iron Pipe Co., 494 F.2d 211, 225 & n. 34 (5th Cir. 1974); Brown v. Gaston County Dyeing Machine Co., 457 F.2d 1377, 1382 (4th Cir.), cert. denied, 409 U.S. 982, 93 S.Ct. 319, 34 L.Ed.2d 246 (1972); Carter v. Gallagher, 452 F.2d 315, 323 (8th Cir. 1971), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972); United States v. Ironworkers Local 86, 443 F.2d 544, 550-51 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971); Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245, 247 (10th Cir. 1970), cert. denied, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1971). Its use in pattern and practice cases is well established in our circuit. See Donaldson v. Pillsbury Co., 554 F.2d 825 (8th Cir.), cert. denied,--- U.S. ----, 98 S.Ct. 177, 54 L.Ed.2d 128 (1977); Green v. Missouri Pacific Ry., 523 F.2d 1290 (8th Cir. 1975); Parham v. Southwestern Bell Telephone Co., 433 F.2d 421 (8th Cir. 1970).
 
 
 43
 The District Court's failure to apply the Griggs test is manifested in the following quotation from its opinion:Although statistical evidence of a pattern or practice of discrimination is of probative value in an individual discrimination case for the purpose of showing motive, intent, or purpose, . . . it is not determinative of an employer's reason for the action taken against the individual grievant.
 
 
 44
 Thus, it is clear that statistics may be admitted to prove racial discrimination, but they are not determinative of the reasons "for the action taken against the individual grievant."
 
 
 45
 Rule v. International Association of Bridge, Structural and Ornamental Ironworkers, Local Union No. 396, supra, 423 F.Supp. at 380.[11]
 
 
 46
 To the extent that the District Court held defendants' motive to be relevant on these pattern and practice claims and to the extent that the District Court considered statistical evidence as being relevant only on the issue of motive, it was in error. Accordingly, we remand the above-mentioned claims of plaintiffs Coe, Vanderson, and Rule for reconsideration under the standards enunciated in Griggs v. Duke Power Co., supra.[12]
 
 
 47
 D. Other Pattern and Practice Claims.
 
 
 48
 Rule also claims that maintaining MTP as a separate entity from the apprenticeship program violates 42 U.S.C. § 2000e-2(c)(2).[13] This claim is premised on the fact that those in the apprenticeship program are mostly white and those in the MTP program are mostly black.[14] Plaintiff contends that because a contractor can request either an apprentice or a trainee, the separate apprenticeship and MTP programs furnish contractors with a vehicle to discriminate against minorities. Plaintiff adduced evidence tending to show that black trainees worked fewer hours than white apprentices during 1974 and 1975.
 
 
 49
 The District Court dismissed this contention as "unfounded." Rule v. International Association of Bridge, Structural and Ornamental Ironworkers, Local Union No. 396, supra, 423 F.Supp. at 381. The District Court's finding of "no evidence" that minority group members are refused membership in the apprenticeship program on account of their race may have been premised, at least in part, on its failure to apply the Griggs standard of proof. Because we are unable to determine with any degree of certainty that the District Court's use of an erroneous standard of proof did not affect its decision on this claim, as well as the preceding claims, we likewise remand this pattern and practice claim to the District Court.
 
 
 50
 Rule next contends that the Union's negotiation of the referral procedures contained in the 1972 Letter Agreement constitutes a violation of Title VII, because the Letter Agreement had the effect of "freezing" the status quo of discriminatory employment practices. This referral system was modified by the consent decree in the Government's case. Under the terms of the consent decree, any minority group person who registers for referral is given priority equal to that of "qualified journeymen." Based on this fact, the District Court found that the referral system "as it is now applied" does not discriminate against blacks. Rule v. International Association of Bridge, Structural and Ornamental Ironworkers, Local Union No. 396, supra, 423 F.Supp. at 380.
 
 
 51
 Rule contends that the District Court erred by not determining liability as of the time of the alleged violation. This contention is well-taken. The fact that subsequent measures have been taken to correct a violation may affect the remedy, but does not affect liability for the violation. See Parham v. Southwestern Bell Telephone Co., supra, 433 F.2d at 426. Because the District Court did not approach the issue in this way, it made no findings as to whether the Letter Agreement referral system operated to discriminate against Rule in 1973. When a District Court has failed to make appropriate findings of fact, an appellate court should not attempt to resolve factual issues on its own. See DeMarco v. United States, 415 U.S. 449, 450, 94 S.Ct. 1185, 39 L.Ed.2d 501 (1974). In such circumstances, the appropriate course of action is to vacate the judgment and remand the case to the District Court. See, e. g., O'Neal v. Gresham, 519 F.2d 803, 805-06 (4th Cir. 1975); Marr v. Rife, 503 F.2d 735, 743 (6th Cir. 1974); General Electric Credit Corp. v. Robbins, 414 F.2d 208, 211 (8th Cir. 1969). See generally 5A Moore's Federal Practice P 52.06(2) at 2718 (2d ed. 1977).
 
 
 52
 Rule's final claim for relief is that defendants maintained, from 1971 to 1973, a pay scale which had the effect of paying trainees less than apprentices. This contention was not addressed by the District Court, and it made no findings thereon. Accordingly, we remand this claim to the District Court. See DeMarco v. United States, supra; General Electric Credit Corp. v. Robbins, supra.
 
 
 53
 E. Conclusion.
 
 
 54
 In summary, the District Court's order is vacated in part and the following claims are remanded to the District Court for further proceedings: (1) the claims of Coe, Vanderson, and Rule that the apprenticeship selection process is discriminatory, and (2) the claims of Rule that the negotiation of the Letter Agreement resulted in a racially discriminatory referral system, that the separation of MTP and the apprenticeship program has a discriminatory effect on referrals, and that paying trainees lower wages than apprentices is discriminatory. The District Court judgment is affirmed as to all other individual claims.[15]
 
 III
 Evidentiary Issues
 
 55
 Because this case must be remanded for further proceedings, it is appropriate to consider plaintiffs' evidentiary claims. Plaintiffs contend that the District Court erred by excluding two items of evidence. In view of our decision on plaintiffs' individual claims, however, we need only address plaintiffs' contention that the District Court erred in excluding certain depositions and answers to interrogatories, which were taken in conjunction with the Government's case.[16]
 
 
 56
 As a general rule, depositions taken in a prior action are admissible in a subsequent action if there is substantial identity of issues and parties in the two actions. See, e. g., Fullerform Continuous Pipe Corp. v. American Pipe & Construction Co., 44 F.R.D. 453, 455 (D.Ariz.1968); Baldwin-Montrose Chemical Co. v. Rothberg, 37 F.R.D. 354, 356 (S.D.N.Y.1964); Hertz v. Graham, 23 F.R.D. 17, 22 (S.D.N.Y.1958), aff'd, 292 F.2d 443 (2d Cir.), cert. denied, 368 U.S. 929, 82 S.Ct. 366, 7 L.Ed.2d 192 (1961); Fed.R.Evid. 804(b)(1). See generally 4A Moore's Federal Practice P 32.02 at 32-11 to 32-12 (2d ed. 1975); 5 J. Wigmore, Evidence § 1338 at 111 (Chadbourn rev. 1974). Defendants contend that there is insufficient identity of parties and issues to warrant admission in this case.[17]
 
 Identity of Issues
 
 57
 The ultimate issue in both the Government's case and the instant case is whether defendants have engaged in racially discriminatory employment practices. Defendants had the same interest in disproving that claim in the prior suit as in the present one. We conclude that there is substantial identity of issues in the two suits.
 
 Identity of Parties
 
 58
 Defendants point out that MTP was not a party to the Government's case. Under the general rule, however, a party to the second suit need not have been a party to the prior suit if the interest of the objecting party in the prior suit was calculated to induce as thorough a cross-examination as the interest of the present opponent. See Hertz v. Graham, supra.
 
 
 59
 MTP is represented by the same attorney who represented the Union and JAC in the Government's case and who was present at the taking of most of the depositions sought to be admitted. In addition, the consent decree in the Government's case placed affirmative duties on MTP, even though it was not a named party to that action. The record also discloses a close interrelationship between the Union, JAC, and MTP. In view of these facts, we are compelled to the conclusion that MTP's interests were adequately protected by the Union and JAC.
 
 
 60
 Having found substantial identity of issues and parties in the two actions, we conclude that the District Court erred in excluding the depositions and answers to interrogatories[18] on the grounds given. Other grounds for exclusion based on content are not before us.
 
 
 61
 The judgment of the District Court is affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion. Since the case was tried to the Court, the record need only be supplemented. See Donaldson v. Pillsbury Co., supra, 554 F.2d at 833-34; Rich v. Martin Marietta Corp., 522 F.2d 333, 347 (10th Cir. 1975).
 
 
 
 [1]
 In addition, the directors of MTP and JAC directly solicit contractors to employ persons in the respective training programs
 
 
 [2]
 In 1964, two black men, Claymont Gould and Roosevelt Robinson, began to work on permit. The first black was not admitted to Union membership until 1967
 
 
 [3]
 In 1971, MTP was changed to a three-year program with a 60% Starting wage, but the initial six-month incremental raise was 5%, whereas the initial six-month incremental raise for apprentices was 10%
 
 
 [4]
 Indeed, a required response would be inconsistent with the "opt-out" provisions of Fed. R. Civ. P. 23
 
 
 [5]
 The District Court, of course, retains the power to modify the class action order, or to decertify the class, if subsequent events so dictate
 
 
 [6]
 The statute provides in relevant part:
 (T)he commission may obtain an order of court for the enforcement of the commissions's decision and order in a proceeding brought in the circuit court of the county wherein the unlawful employment practice which is the subject of the commission's order occurred, or the county wherein any person required in the order to cease and desist from an unlawful employment practice, or to take other affirmative action, resides or conducts his business. The record on the commission's petition for enforcement shall consist solely of duly certified records of the commission showing that it has jurisdiction over the respondent, that the procedure prescribed by this section has been complied with, and a certified copy of the commission's order with proof of service.
 
 
 [7]
 Plaintiff Rule also contends that the Union violated Title VII by deliberately delaying the proceedings before MCHR. Although there is some force to plaintiff's argument that such a delay may contribute to continuation of prior discriminatory practices, we find no authority for the proposition that such a delay itself constitutes an independent violation of Title VII
 
 
 [8]
 In order to be eligible for the apprenticeship program, an applicant must: (a) be between 18 and 30 years old (35 years old for men honorably discharged from the armed services); (b) possess a physician's certificate of physical fitness; (c) be a United States citizen or have declared an intention to become a citizen; and (d) possess a high school diploma or a G.E.D
 
 
 [9]
 Pursuant to the 1973 consent decree, JAC has now set aside 15 positions in each class to be filled by minorities. The remainder of the class is then filled by the highest ranking applicants
 
 
 [10]
 Plaintiffs center their challenge to the apprenticeship selection process on the disparate racial impact of the Flannigan aptitude test, which accounts for 15 of the 100 possible points. This challenge is misplaced. The apprentice selection process must be viewed as a whole to discover whether there is a disparate racial impact. If the process as a whole does not have a disparate exclusionary impact on blacks, then the fact that blacks fare less well than whites on one "subtest" is insufficient to establish a prima facie case. See Smith v. Troyan, 520 F.2d 492, 498 (6th Cir. 1975). Of course, if the overall selection process has a discriminatory effect, and that effect can be traced to specific elements of the selection process, the court may take these facts into account in fashioning a remedy
 Coe and Vanderson also challenge the use of the Flannigan test because it has not been validated as required by the consent decree in the Government's case. The consent decree grants the United States a right of enforcement. We perceive no error in the District Court's holding that plaintiffs lack standing to sue to enforce the consent decree. This discussion does not apply to challenges to the eligibility requirements for the apprenticeship program. See note 8, supra.
 
 
 [11]
 This portion of the District Court opinion relied heavily on our decision in King v. Yellow Freight System, Inc., 523 F.2d 879, 882 (8th Cir. 1975). This reliance was misplaced because, unlike the instant case, King did not involve a challenge to employment qualifications
 
 
 [12]
 We note that the Supreme Court has recently offered some guidance in calculating the "standard deviation" as a method of validating the racial basis for such statistical disparity. See Hazelwood School District v. United States, 433 U.S. 299, 97 S.Ct. 2736, 2742 & n. 14, 2743 & n. 17, 53 L.Ed.2d 768 (1977); Castaneda v. Partida, 430 U.S. 482, 97 S.Ct. 1272, 1281 & n. 17, 51 L.Ed.2d 498 (1977)
 
 
 [13]
 The statute provides in relevant part:
 (c) It shall be an unlawful employment practice for a labor organization
 (2) to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin . . . .
 
 
 [14]
 At the time of trial, 70 or 71 of 89 apprentices were white and 38 of 43 trainees were black
 
 
 [15]
 We emphasize that our action is not intended to express any view on the merits of the claims which are remanded to the District Court. We further note that the remanded claims largely parallel the class claims and may be considered as a part thereof
 
 
 [16]
 Plaintiffs also contend that the District Court erred in excluding, on the basis of the attorney-client privilege, a letter from an attorney to the Secretary-Treasurer of the Union. Because the letter was only relevant to Rule's claim of delay before the MCHR, which we have found not to state a cause of action under Title VII, see note 7, supra, we find that the alleged error, if any, was harmless
 
 
 [17]
 Defendants also argue that the depositions were inadmissible because there was no showing that the deponents were unavailable. However, no showing of unavailability is necessary when the deponent is an agent or servant of a party opponent and makes a statement concerning a matter within the scope of his agency or employment during the existence of that relationship. Fed.R.Evid. 801(d)(2)(D). We are satisfied that the deponents here meet these criteria. In addition, the deponents come within Fed.R.Civ.P. 32(a)(2), which provides:
 The deposition of a party or of anyone who at the time of taking the deposition was an officer, director, or managing agent, or a person designated under Rule 30(b)(6) or 31(a) to testify on behalf of a public or private corporation, partnership or association or governmental agency which is a party may be used by an adverse party for any purpose.
 Many of the deponents were officers of the Union, MTP, and JAC, and the others fall within the broad definition of "managing agent." See, e. g., Terry v. Modern Woodmen of America, 57 F.R.D. 141, 143 (W.D.Mo.1972); In re Manor Inv. Co., 43 F.R.D. 299, 300-01 (S.D.N.Y.1967); Independent Productions Corp. v. Loew's Inc., 24 F.R.D. 19, 24-26 (S.D.N.Y.1959).
 
 
 [18]
 The preceding discussion has dealt solely with depositions. The answers to the interrogatories are clearly admissible as admissions of a party opponent